*534
 
 OPINION OF THE COURT
 

 Bellacosa, J.
 

 The State Organized Crime Task Force (OCTF) spearheaded criminal investigations and prosecutions stemming from alleged rigged harness racing at Yonkers Race Track in Westchester County, and from other alleged bookmaking gambling activities in Rockland County. These appeals are authorized by respective Judges of this Court under grants of leave to appeal to some defendants in two discrete groupings of prosecutions.
 

 The cases share a common threshold question since the onset of these prosecutions — statutory standing. The defendants sought judicial suppression of telephonically acquired evidence.
 

 In appellant Grant’s case, an additional substantive law question is presented — whether Grant can theoretically be found guilty of larceny by false promise crimes, under New York’s Penal Law definition and theory.
 

 The Appellate Division, on separate appeals to that court by the OCTF and the District Attorney of Rockland County, ruled that most defendants — appellants before us — lacked statutory standing. That court thus reversed respective County Court rulings that had accorded statutory standing and granted suppression of pertinent evidence. We reverse, grant standing, and remit to the Appellate Division for further proceedings.
 

 I.
 

 On January 9, 1995, a Justice of the Appellate Division issued a pen register and trap and trace order allowing the installation of devices on several telephone poles, and lines assigned to Daniel Kramer. This investigatory step was based on reasonable suspicion of Kramer’s involvement in crimes relating to the promotion of gambling. The authorization identified the targets of the investigation as “Daniel P. Kramer, his agents, co-conspirators and others as yet unknown.” That authorization was extended by further orders, dated January 17, 1995 and March 8, 1995.
 

 
 *535
 
 The pen register devices included something called a “slave,” which was installed on the telephone line, and a dialed number recorder, which recorded the information transmitted by the slave. The devices had the capacity to intercept and record either digital or aural transmissions, depending on whether they were set for “audio off” or “audio on.” The switch from one mode to the other could be accomplished by a technician adjusting a switch attached to the slave. While in “audio off” mode, the devices intercepted appellant Grant’s telephone number, along with many others. Based on the information obtained through the pen register and trap and trace devices, OCTF advanced its efforts to an application for a more invasive eavesdropping warrant encompassing Kramer’s telephone lines. The order was issued on March 24, 1995.
 

 The intercept technology was then switched to “audio on.” The instruments allegedly began picking up and recording conversations between Kramer and appellants Joseph Ascenzio, Thomas Bruno, Alphonse Cuzzo, Paul Cuzzo, Joseph Daniello, Robert Daniello and Patsy Capolongo. These appellants, along with others, were eventually charged as Kramer’s co-conspirators relating to numerous offenses arising from the alleged scheme to fix harness horse races at Yonkers Raceway.
 

 All defendants moved to suppress direct and derivative evidence obtained through the various devices, on the ground that under
 
 People v Bialostok
 
 (80 NY2d 738,
 
 mot to recall opn denied
 
 81 NY2d 995), the devices initially used by the investigators were not simply pen registers. Urging that the technology had aural capacity to intercept and record conversations when flipped to audio mode, defendants argued that the devices fell under the
 
 Bialostok
 
 rubric that might require a probable cause basis before they could be installed and used, even when only used to register telephone numbers. Grant also moved to dismiss counts of grand larceny and conspiracy to commit grand larceny with which he had been charged on a theory of larceny by false promise (Penal Law § 155.05 [2] [d]).
 

 County Court, Westchester County, determined that defendants, as targets of the investigation, had standing to challenge the pen register evidence and other evidence obtained through the subsequent, related eavesdropping warrant. The court subsequently determined that, based on their capacity to intercept and record conversations, the pen registers used on Kramer’s telephone lines functionally constituted eavesdropping devices under
 
 Bialostok.
 
 Because no eavesdropping warrant was obtained prior to the initial installations, the court
 
 *536
 
 suppressed all of the pen register evidence. Furthermore, the court held that without the pen register acquisitions, the OCTF lacked probable cause for the eavesdropping warrant. It thus also suppressed the poisoned fruits evidence obtained pursuant to that warrant. Additionally, the court dismissed the larceny counts against Grant.
 

 The Appellate Division reversed, ruled out standing for these defendants, and reinstated the larceny counts against Grant.
 

 A Judge of this Court granted leave to appeal as to all defendants adversely affected by the Appellate Division order.
 

 II.
 

 In the bookmaking cases prosecuted by the Rockland County District Attorney’s office, a Justice of the Appellate Division issued a pen register and trap and trace order on October 18, 1995. It authorized installation of devices on the telephone lines of Thomas Feeney, based on reasonable suspicion of his involvement in gambling-related crimes. The designated targets of the investigation were Feeney “and others now known and unknown.” Pen registers identical to those used in the OCTF race-fixing investigation were installed, along with trap and trace devices.
 

 A trap and trace device captured appellant John Andriello’s telephone number, along with others. Based on the pen register and trap and trace evidence, the District Attorney expanded the scope of the investigation through an eavesdropping warrant. The pen registers were then switched to “audio on.” Subsequently, an incriminating conversation between Andriello and appellant Melvin Amiel was recorded, as were conversations between Andriello and Feeney.
 

 Amiel and Andriello were charged, along with Feeney and several others, with various counts of promoting gambling, possession of gambling records, and conspiracy. Amiel and Andriello moved to suppress the evidence based, in part, on the contention that the initial pen registers violated the
 
 Bialostok
 
 rule that might require a higher level probable-cause-based eavesdropping warrant.
 

 County Court, Rockland County, determined that Amiel lacked standing to challenge the pen register and trap and trace order because no evidence existed supporting his contention that he was using a co-defendant’s telephone at the time that its number was captured by the pen register. However, the court determined that Amiel had standing to challenge the
 
 *537
 
 eavesdropping warrant. The court accorded standing to Andriello to challenge the order because his telephone number was captured by a trap and trace device installed pursuant to the order.
 

 After a hearing, County Court suppressed all evidence derived from the pen register and subsequent eavesdropping and search warrants as to all defendants. The court determined that the pen register devices violated
 
 Bialostok,
 
 and that without the information obtained from them, probable cause was lacking for the eavesdropping and search warrants.
 

 The Appellate Division modified by reversing the County Court order insofar as it pertained to Amiel and Andriello. It held that neither of them had standing to challenge the pen register order because they were not identified as targets of the investigation in the order or the application papers submitted to obtain the judicial authorizations.
 

 Notably, the Appellate Division affirmed so much of County Court’s order as granted the suppression motions of other defendants who are not appellants here. The Appellate Division concluded that those defendants had standing as targets of the investigation because they were specifically identified in the applications underlying the order. In these instances, the court also determined that an eavesdropping-type warrant was required under
 
 Bialostok.
 
 Because the initial technology was installed without probable cause, all evidence obtained from any source had to be suppressed as to those defendants because, without the pen register acquisitions, a probable cause level was never reached to support the eavesdropping warrant.
 

 A Judge of this Court granted Amiel and Andriello leave to appeal.
 

 III.
 

 This Court’s handling of the intricate statutory standing analysis requires us to synthesize several provisions of the CPL, the CPLR and the Penal Law as they pertain to standing to challenge pen registers and trap and trace devices, and electronic communication interceptions generally. The technology moves faster than the law and it is important to law enforcement authorities, but it cannot be allowed to outpace the array of checks and balances and protections affecting these privacy intrusions, important to individuals and society at large (see
 
 generally, People v Capolongo,
 
 85 NY2d 151).
 

 As defined in the Criminal Procedure Law, a pen register is “a device which records or decodes electronic or other impulses
 
 *538
 
 which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached” except where such a device is used for billing or cost accounting by a provider of electronic communication (CPL 705.00 [1]). A trap and trace device “captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted” (CPL 705.00 [2]).
 

 CPL 710.20 (7) provides that a defendant who is “aggrieved” by the unlawful or improper acquisition of evidence by means of a pen register or trap and trace device can move to suppress that evidence. If it is determined that the device was installed or used in violation of relatively new CPL article 705, the evidence must be suppressed
 
 (see, People v Bialostok,
 
 80 NY2d 738,
 
 supra
 
 [decided in 1993 affecting devices installed in 1986; CPL art 705, enacted in 1988]).
 

 CPL 710.10 (5) defines an “aggrieved” person as including, but
 
 “in no wise limited to”
 
 (emphasis added), persons defined in CPLR 4506 (2). CPLR 4506 (2) (a) and (c) provide, as relevant here, that an aggrieved person is one who is the sender or receiver of telephonic or telegraphic communication that is overheard or recorded by means of any instrument, device or equipment, or a person against whom the overhearing or recording is directed. CPLR 4506 (2) does not explicitly recognize the kind of digital electronic communication captured by a pen register.
 

 The Legislature’s inclusion of pen register and trap and trace evidence in the list of evidence subject to suppression under CPL 710.20 might be rendered functionally illusory unless the statutory standing interpretation were given a generous sweep, crafted by interstitial common-law adjudication, for standing to challenge legality of such intrusions
 
 (see, People v Capolongo, supra,
 
 at 161-163 [filling a gap in “New York’s comprehensive statutory scheme governing electronic eavesdropping” by applying statutory notice requirement (CPL 700.70) to foreign wiretap evidence to enable a defendant to seek suppression of such evidence under CPL 710.20];
 
 People v Bialostok, supra,
 
 at 744 [acknowledging that the US Supreme Court has determined that citizens do not have a constitutionally protected privacy interest in the telephone numbers dialed from their telephones]). This approach is also consistent with expansive alternative descriptions in CPLR 4506 (2), designed for amplitude not stinginess, and reflective of this State’s “strong public policy of protecting citizens against the insidious
 
 *539
 
 ness of electronic surveillance by both governmental agents and private individuals”
 
 (People v Capolongo, supra,
 
 at 160).
 

 The context of the enactment of CPL 710.20 (7) also supports the conclusion that the Legislature intended to provide a statutory basis for pen register standing, proportionate and appropriate to that already in place by enactment covering eavesdropping standing — though not necessarily equivalent. By the same enactment, the Legislature added the term “electronic communication” to the definition of “eavesdropping” found in Penal Law § 250.00, and made the accessing of such information a felony under Penal Law § 250.05 (see, L 1988, ch 744;
 
 see also,
 
 CPL 700.05 [3-a]). Importantly, “electronic communication” is understood to include the digital information captured by a pen register (Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 700.05, at 560). •
 

 In the circumstances presented by these cases, the surely unintended ellipsis in the statutory framework of pen register standing can be — and should be — filled by interpretive analogy to and tie in with CPLR 4506 (2), viewed in light of the Legislature’s own expansive language of CPL 710.10 (5) (cf.,
 
 People v Capolongo,
 
 85 NY2d 151,
 
 supra).
 
 We underscore that this is not some form of general or automatic standing; we deem it and treat its inextricably intertwined circumstances as particularized in a relatively
 
 sui generis
 
 set of applications, under these statutory authorizations, surely not under any constitutional command or on any per se expansion of standing principles.
 

 As noted above, however, CPLR 4506 (2) confers standing on individuals whose telephonic or telegraphic communications have been overheard or recorded by an eavesdropping device. The electronic communication captured by a pen register or a trap and trace device can be comparable to the aural or telegraphic communication captured by an eavesdropping device. Thus, when the Legislature added pen register and trap and trace evidence to the list of classifications subject to suppression, and when this Court decided
 
 Bialostok,
 
 both Branches together treated and recognized these devices as warranting some comparable level of standing opportunity to challenge evidence for all individuals whose varied and overlapping electronic communications might be intercepted.
 

 We are persuaded to this view also because interpretive analysis to the contrary might produce absurd and fundamentally unfair results. To countenance an unintended standing gap or
 
 *540
 
 an unreasonably high standing bar — when the Legislature has so meticulously regimented this regulatory universe because of its technological wonders accompanied by attendant dangers — is neither supportable, nor rational.
 

 By analogy to CPLR 4506 (2) (a), our analysis therefore recognizes particularized statutory standing for appellants Grant and Andriello, whose telephone numbers were undisputedly captured by a pen register and a trap and trace device, respectively. The remaining appellants are afforded a like opportunity through the operation of CPLR 4506 (2) (c), as evolved targets of the investigations.
 

 All the defendants who are appellants before this Court were surely contemplated, albeit not initially named and identified, within the catch-all language in the applications and judicial authorizations. The CPL contemplates that unknown individuals are likely to be targets of an investigation. Indeed, CPL 705.20 (3) (c) provides that a pen register or trap and trace order must contain “the identity, if known, of the person who is the subject of the criminal investigation.” The same requirement applies to an application for a pen register or trap and trace order (see, CPL 705.15 [2] [b] [iii]).
 

 That inchoate status, at the outset of an application for a judicial order, should not permanently insulate the law enforcement crew’s actions for pure statutory standing purposes, nor should it deprive the eventually tagged targets of standing — a mere opportunity to contest legality before a neutral tribunal. When they emerge into identifiable targets through technology that downloads their developing profiles and other descriptive identifying data, they should be allowed to question the legality of the net deployed to capture them.
 

 Thus, under a realistic reading of CPLR 4506 (2) (c), all the later-tagged individuals, who became identifiable targets by virtue of the pen register order, should be deemed subjects of the investigation, in the words of the statute, to qualify initially for at least statutory standing to challenge that order. Indeed, boilerplate catch-all language ought to be read to enlarge, not permanently freeze, the category of persons deemed subjects of the investigation for standing-to-challenge purposes. To more narrowly apply the standing predicate, as the Appellate Division did in these cases, would not make good, evenhanded, evenly applied law in this area, especially in these sets of cases. Moreover, as a practical consequence, a cabined judicial attitude might foster an incentive for law enforcement
 
 *541
 
 to exclude the names of known or questionable targets from pen register applications, just to strategically block those individuals from garnering an eventual standing opportunity to challenge the legality of the methods used to acquire evidence.
 

 We are satisfied under the circumstances presented by this case and our flexible interpretation of the pertinent statutes that all appellants in both sets of prosecutions acquired standing.
 

 IV.
 

 Having concluded only that all appellants have statutory standing to challenge the respective pen register and trap and trace orders, it is appropriate to remit these matters and cases to the Appellate Division. That court should exercise its standard review of the facts, and make a technology/fact-applied determination whether the pen register usage in these cases tripped into or overlapped to probable cause eavesdropping warrant status
 
 (People v Bialostok, supra,
 
 at 744).
 

 We take note in this regard, that the Appellate Divisions seem to have construed
 
 Bialostok
 
 as a per se template, classifying any audio-capable pen register as an eavesdropping device
 
 (see, e.g., People v Fiore,
 
 246 AD2d 664 [2d Dept],
 
 lv denied
 
 91 NY2d 941;
 
 People v Gilpin,
 
 216 AD2d 62 [1st Dept];
 
 People v LaMendola,
 
 206 AD2d 207 [4th Dept]).
 
 Bialostok
 
 should be understood and applied as a more fact specific, adaptable legal guidepost for sophisticated modern technologies. It should require scrutiny and examination of the pen register technology as used in a given investigation and situation. The appropriate judicial assessment should include not only the capacity of the device used to intercept, hear and record communication, but the manner in which it does so and its susceptibility to evasion of statutory, precedential, and even constitutional protections, although the latter are not raised in these cases. The judicial scrutiny should also take into consideration whether the particular device acquires the contents of communications even when in digital mode, and the ease required to convert or manipulate the instrumentality from digital to audio capability
 
 (see, People v Bialostok, supra,
 
 at 744). If the digital and audio functions are sufficiently discrete and the susceptibility to misuse is remote, the mere fact that the technology may be audio-capable may not be per se dispositive of the type of warrant required for installation. On the other hand, indeterminacy of sophisticated technologies
 
 *542
 
 should, not be allowed to pull the rug out from under statutory standing for individuals to shed judicial light .onto the law enforcement methods as they affect targeted persons.
 

 In the instant cases, the trial courts held hearings to determine whether the pen registers used in these investigations were functionally eavesdropping devices that would require warrants based on probable cause. The records created during those hearings may well form a sufficient basis for the Appellate Division to fulfill its fact review powers in applying the operative law principles in the light of this opinion. We therefore remit all the matters before us to the Appellate Division for that court’s review of this issue, and any other issues raised but not yet ruled upon in the appeals to that court.
 

 V.
 

 Finally, we address the viability of the pure law question concerning the larceny counts charged against Grant. The People theorized that Grant wrongfully deprived bettors of wagered money when he caused winnings to be transferred from otherwise winning bettors, by virtue of his deliberate restraint of his horse in order for it to lose the race. The People call this larceny by false promise. We do not see it that way and conclude that the Legislature never contemplated this fact scenario for that crime classification.
 

 Larceny by false promise is committed when, pursuant to a scheme to defraud, a person or a third person obtains property of another by means of a representation, express or implied, that future conduct will be engaged in when there is no intent that it will come about (Penal Law § 155.05 [2] [d]).
 

 In any prosecution for larceny based upon a false promise, the defendant’s intention or belief that the promise would not be performed may not be established by or inferred from the fact alone that such promise was not performed; such a finding may be based only upon the evidence establishing that the facts and circumstances of the case are wholly consistent with guilty intent or belief and wholly inconsistent with innocent intent or belief, and excluding to a moral certainty every hypothesis except that of the defendant’s intention or belief that the promise would not be performed (Penal Law § 155.05 [2] [d];
 
 see, People v Norman,
 
 85 NY2d 609, 619-620).
 

 OCTF has not identified to this Court exactly what kind of promise it is upon which their allegations are based. The case seems to hinge on an implied general promise to race to win,
 
 *543
 
 as the linchpin ingredient. This, in turn, is loosely associated, apparently, with the race driving license issued to Grant many years before the race at issue. The OCTF cites to no authority for enlarging larceny by false promise to anything resembling these facts and this theory. Indeed, these facts may more properly fit under a fraud category, as County Court determined — even more specifically, under the category of tampering with a sports contest (Penal Law § 180.50) or sports bribe receiving (Penal Law § 180.45). Although the Appellate Division acknowledged the novelty of the People’s larceny theory, it drew support from its perception of the legislative intent that the larceny statute should be broadly interpreted as applied here
 
 (People v Kramer,
 
 244 AD2d 426, 429,
 
 lv granted sub nom. People v Grant,
 
 91 NY2d 892, citing
 
 People v Foster,
 
 73 NY2d 596, 604). We disagree with its perception and ruling in that regard.
 

 The inappropriateness of trying to shoehorn these facts into a larceny by false promise fit is illustrated in part by the difficulty, if not the impossibility, of accepting that at the time Grant obtained his racing license 15 years ago, he did not intend to keep a yet to be formed implied promise to try to win every race during his career. The theory is too thin and the stretch too great. We therefore conclude that the larceny counts against appellant Grant were rightly removed from this case by County Court.
 

 Accordingly, the orders of the Appellate Division should be reversed and these cases should be remitted to the Appellate Division for further proceedings in accordance with this opinion.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick and Wesley concur.
 

 In each case: Order reversed and case remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein.